IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
_____
                                 :
COLLEEN E. MCBRIDE,              :
                                 :   HONORABLE JEROME B. SIMANDLE
              Plaintiff,         :
                                 :
                                 :   Civil No. 10-2773 (JBS-AMD)
         v.                      :
                                 :
COUNTY OF ATLANTIC, NEW JERSEY,  :
et al.,                          :        OPINION
                                 :
              Defendants.        :
_____:
```

APPEARANCES:

Joseph C. Grassi, Esq.
BARRY, CORRADO, GRASSI & GIBSON, P.C.
2700 Pacific Avenue
Wildwood, NJ 08260
     Counsel for Plaintiff

Thomas J. Decker, Esq.
DECKER & MAGAW, ESQS.
507 Westfield Avenue
Westfield, NJ 07090
     Counsel for Defendant CFG Health Systems, LLC

**SIMANDLE**, Chief Judge:

I.   **Introduction**

This matter, involving alleged inadequate medical treatment for a New Jersey state pretrial detainee, as well as alleged violations of the United States and New Jersey Constitutions, is before the Court on a motion for summary judgment by Defendant CFG Health System LLC ("CFG"). [Docket Item 36.] Plaintiff Colleen McBride claims that she sustained injuries after falling

from her bunk in her cell and, although she was seen several times by nurses, she was not seen by a physician until several days later, by which time an infection had spread underneath the hematoma in her chest, requiring special surgery. [Compl. ¶¶ 10-11, 15, 20-49.]

At this stage, the only remaining claims against Defendant are those brought under 42 U.S.C. § 1983 for violations of the due process clause of the Fourteenth Amendment and under the New Jersey Constitution, N.J. Const. art. I, ¶ 1.[1] Plaintiff alleges that "CFG's institutionalized failure to train, supervise and discipline its staff members 1) constitutes deliberate indifference to McBride's due process rights, and 2) caused the unconstitutional failure in care to occur." [Pl. Opp'n at 2.]

The key inquiries for the Court are whether Plaintiff has adduced evidence that would permit a reasonable jury to find (1) that CFG acquiesced to the practice or custom of its employees disregarding procedures concerning the handling of sick call

---

[1] The Court previously granted CFG's motion for summary judgment on state-law claims alleging negligent medical treatment. McBride v. Cnty. of Atlantic, No. 10-2773, 2011 WL 3236212, at *5 (D.N.J. July 28, 2011) [Docket Item 26]. In addition, Plaintiff now voluntarily withdraws her claims under the Eighth Amendment to the U.S. Constitution and its analogue under the New Jersey Constitution, N.J. Const. art. I ¶ 12, because Plaintiff was a pretrial detainee and not a convicted inmate protected by the Eighth Amendment. [Pl. Opp'n at 2.] Plaintiff also "withdraws any claim that CFG is vicariously liable under Section 1983 for the actions of its employees." [Id.]

2

requests, and (2) that CFG was deliberately indifferent to Plaintiff's serious medical needs.

Because the Court answers these questions in the negative, the Court will grant CFG's motion for summary judgment.

## II.  Background

Plaintiff Colleen McBride filed this lawsuit against County of Atlantic, New Jersey, Atlantic County Justice Facility ("ACJF"), CFG Health Systems, and two nursing employees of CFG, as well as several unnamed correctional officers, unknown medical personnel and unnamed corporations.[2] See McBride, 2011 WL 3236212, at *1-*2 (recounting the factual allegations in the Complaint). The principal controversies in this case concern CFG's policies for handling of sick call requests of inmates or detainees and determining when inmates or detainees should see a physician rather than a nurse. Plaintiff's main allegation is that Plaintiff's sick call slips were not handled properly, resulting in a delay in her seeing a physician, rather than a nurse, and because of this delay, she suffered from an infection that required a special procedure. The facts are undisputed, unless noted.

### A. Facts

### i. Plaintiff's injury and treatment

---

[2]  Only CFG and Atlantic County have filed answers to the Complaint. [Docket Items 2 & 4.]

Plaintiff was incarcerated as a pretrial detainee in the ACJF from March 5, 2008, to April 9, 2008, during which time CFG held a contract to provide medical services at the facility. (Def.'s Statement of Undisputed Material Facts ("DSF") ¶ 6.)

On March 31, 2008, Plaintiff fell from the top bunk in her cell and sustained a hematoma to her chest wall. (Id. ¶¶ 7-8.) It is disputed whether Plaintiff submitted a written sick call slip requesting to be seen by a nurse that day.[3] However, it is undisputed that Plaintiff was examined by nurses twice on March 31. (DSF ¶¶ 9-10; see also Def. Ex. D at 5 (describing the two nurse encounters on March 31, recorded in Plaintiff's ACJF Interdisciplinary Progress Notes, part of her medical record).) First, Plaintiff was seen by Nurse Krawiec, a licensed practical nurse. (DSF ¶ 9.) Plaintiff complained to Nurse Krawiec of injuries sustained in her fall and of lower-back pain. (Id.) Nurse Krawiec applied ice and gave Plaintiff Tylenol for pain relief. (Id.) Later, Plaintiff was seen by Defendant Nurse Practitioner Joanne Loeffler, R.N., who ordered x-rays to rule out a fracture of the sternum. (Id. ¶ 10.)

---

[3] (See Pl.'s Counterstatement of Facts ("PCF") ¶ 30 (stating Plaintiff "made a written request for medical treatment"); Def.'s Resp. to PCF ("DRF") ¶ 30 ("A sick call slip for March 31 is not in the plaintiff's medical record"); McBride Dep. (Pl. Ex. D) at 84:7-15 (testifying that she had filled out a slip on the day of the incident).)

The next day, on April 1, 2008, Nurse Loeffler saw Plaintiff again and noticed continued swelling on her chest. (Id. ¶ 11.) Nurse Loeffler took Plaintiff's vital signs, gave Plaintiff an ice bag, and ordered an increase in Tylenol. (Id.) Plaintiff testified that she orally requested to be seen a second time on April 1, to a corrections officer.[4] (McBride Dep. at 74:24-76:15.) Defendants respond that "[t]here is no record of the oral request but the plaintiff was seen on April 1, 2008 at 2:45 p.m. by Joanne Loeffler." (DRF ¶ 50.) On April 2, 2008, Plaintiff had a second round of x-rays taken by a technician. (PCF ¶ 55.) Plaintiff did not make a written sick call request on April 2. (Id.)

On Thursday, April 3, 2008, Plaintiff filled out a sick call slip requesting additional medical attention. (Id. ¶ 12; Def. Ex. D at 11.) Plaintiff wrote on the slip that she continued to have a lot of chest pain and that the swelling "is not going down." (Def. Ex. D. at 11.) She wrote she was having trouble sleeping and could only sleep on her side. (Id.) She requested more ice and more Tylenol, "or send me to Hospital. . . . I'm medically concerned." (Id.) She also made reference on the slip to "x-ray results." (Id.) No one examined Plaintiff on April 3, however

---

[4] Plaintiff testified she does not remember filling out a sick call slip on April 1. (McBride Dep. at 75:16-17.) There is no written slip documenting this request in the record.

Nurse Loeffler made a notation in Plaintiff's Interdisciplinary Progress Notes ("Progress Notes") that indicates Plaintiff's x-rays were negative. (PCF ¶ 61; Def. Ex. D. at 6.)

On Friday, April 4, 2008, Plaintiff was seen by Nurse Davenport, who recorded on Plaintiff's Progress Notes chart that both rounds of x-rays were negative and that she would "redo x-ray of sternum and give Motrin and Tylenol for pain. Will continue to monitor." (Def. Ex. D at 6.) On April 5, 2008, Plaintiff saw the CFG dentist, who noticed her bruising and swelling and prescribed her antibiotics. (PCF ¶¶ 74-75.)

The first doctor to see Plaintiff was Dr. Nugent, the sick doctor on call, on Monday, April 7, 2008, shortly after noon -- one week after Plaintiff's fall. (DSF ¶ 14; Def. Ex. D at 6.) Dr. Nugent examined Plaintiff and ordered an off-site referral for Plaintiff to see an general surgeon for an incision and drainage of an abscess in her chest. (Id.) At 2:15 p.m. on April 7, an appointment was made for Plaintiff to see Dr. Salartash. (Def. Ex. D at 7.)

Dr. Salartash saw Plaintiff on April 9, 2008, at the Atlantic Coastal Surgery Office and ordered her to return the next day, April 10, for the incision and drainage. (Id. ¶ 15.) Dr. Salartash performed part of the surgery on April 10, but, due to an infection, he referred her to Shore Memorial Hospital for a

6

second procedure. (Id.; PCF ¶¶ 83-84; DRF ¶¶ 83-84.) Dr. Fred
Weber's Operative Report from Shore Memorial Hospital dated April
18, 2008, explains that the second procedure performed was
"[d]ebridement left supraclavicular joint with removal of
articular cartilage" and the postoperative diagnosis was
"[s]eptic arthritis of the left supraclavicular joint." (Pl. Ex.
A.) Plaintiff never returned to the ACJF. (DSF ¶ 6.)

**ii. CFG's sick call policy**

Section E: J-07.01 ("Inmate Care and Treatment") of the CFG
Manual of Policies and Procedures for Health Services sets forth
the sick call procedure to be followed in the ACJF. (Def. Ex. G
at 1.) The stated purpose of the policy is to outline a
systematic process to ensure "at least daily access to health
care services from qualified health professionals" and that sick
call requests "are documented and triaged within 24 hours of
submission" and that "care is received immediately if emergent or
within 48 hours of triage if non-emergent." (Id.) The policy
provides for "nurse sick call" seven days a week, and "physician
sick call" five days a week, with emergency services available at
any time. (Id. ¶ 2.)

The "scheduled sick call" process is as follows: inmates[5]
requesting medical care fill out sick call slips, which are

---

[5]  The Court uses the word "inmate" in this section to refer to
pretrial detainees, as well.

handed to nurses during the daily "pill pass" when nurses distribute medicine to inmates. (Id. ¶¶ (A)(1)-(2).) All sick call slips are reviewed within 24 hours of collection and, importantly, "[a]ll requests will be reviewed by the nurse and the date, time and disposition of the review, along with the initials of the nurse will be indicated on the upper right hand corner of the sick call request." (Id. ¶¶ (A)(4)-(5).) A licensed practical nurse, or "LPN," sorts the sick call slips, which are given in turn to the nurses for "triage and disposition," meaning the slips will be placed on lists for the inmates to be seen by a nurse or a physician; "[t]his review will be done overnight." (Id. ¶ (A)(7)(b) and (g).) The Director of Nursing will flag whether any inmates must be seen immediately or in the morning, and "note the disposition on the sick call sheet." (Id. ¶ (A)(7)(h).) After the patients are seen, "ALL slips are to be returned to nursing from which the Sick Call Encounter Form will be generated." (Id. ¶ (A)(7)(k).)

In a subsection labeled "Injuries/Injury Reports," the policy provides that qualified health service unit personnel "will see and triage all injuries immediately upon notification" and that "[n]on-emergency sick call complaints will be seen (as practical) within 48 hours of the receipt of the sick call request." (Id. ¶ (A)(11)-(12).) "The health care providers will

8

utilize the Sick Call Request form for the inmate to request a
sick call encounter as well as documentation of the encounter.
Once the inmate is seen and evaluated, the form will be
completed, signed, dated and filed in the inmate's healthcare
record." (Id. ¶ (A)(13).) The policy further provides that
"[i]nmates evaluated two times for the same complaint by the NP
[nurse practitioner] in a one-month period will automatically be
referred to the next highest credentialed medical provider at the
time of the third complaint." (Id. ¶ (A)(22).) "If the inmate is
referred by the NP to the next level of care, i.e. the physician,
generally the inmate will be seen within one week of the
complaint according to acuity." (Id. ¶ (A)(16).)

### iii. Plaintiff's sick call slips and encounter documentation

As previously noted, there is a dispute about whether
Plaintiff filled out a sick call slip on the day of the incident,
March 31. Plaintiff testified that she did. (McBride Dep. at
84:7-15.) Defendants point out that no sick call slip for March
31 is in Plaintiff's medical record. (DRF ¶ 30.)

There is no evidence in the record of a written sick call
slip from April 1. Plaintiff testified she made an oral request
for treatment but does not remember filling out a slip.(McBride
Dep. at 74:24-76:17.) Defendants again point out that no sick
call slip from April 1 is in Plaintiff's medical record. (DRF ¶

50.) There is no written sick call slip in the record from April
2; Plaintiff does not allege that she filled one out on that
date.

According to the record evidence, Plaintiff's medical record
currently contains only one sick call slip dated after
Plaintiff's fall.[6] (Def. Ex. D. at 11.) That is the slip from
April 3, described above in Part II.A.i. That slip is the first
written request for medical treatment made by Plaintiff after
having seen a nurse practitioner twice. The photocopy of the
April 3 slip in the record is not a perfect reproduction, but,
viewed in conjunction with Plaintiff's dental request slip from
March 20, it appears that a date stamp appears in the upper-
right-hand corner; that date could be "APR 03 2008" but the Court
cannot be certain.[7] (Id.) No other markings by the CFG staff
members appear on the slip.

All of Plaintiff's encounters with nurses and doctors after
her fall were recorded in her Progress Notes, including
Plaintiff's two nurse encounters on March 31, Nurse Loeffler's

---

[6] The record contains one other sick call slip from Plaintiff,
dated March 20, 2008, in which she requests dental treatment to
pull a tooth. (Def. Ex. D. at 10.) Although the photocopy of the
slip provided to the Court is not crystal clear, the slip appears
to have the date "MAR 21 2008" stamped in the upper-right-hand
corner. No initials or other markings by the CFG staff are
apparent.
[7] The April 3 slip also appears in the record as Pl. Ex. S, but
that reproduction does not reveal more detail about the markings
in the corner.

evaluation on April 1, Nurse Davenport's entry on April 4, and Dr. Nugent's entry on April 7. (Id. at 5-9.)

### iv. CFG staff meeting minutes

The record also contains the minutes from CFG staff meetings from February 20, 2008, and April 8, 2008 (Pl. Ex. K & L), which Plaintiff contends are relevant to show the issues and problems CFG had identified with its staff and services around the time that Plaintiff fell.

The most relevant entry for present purposes is listed as "Problem #4" in the February 20 minutes and concerns the process for handling sick call slips and checking to see if an inmate has been seen previously for the same complaint. The entry includes the reminder:

> When NSC [nurse sick call] is being triaged, charts should be checked to see if they have been seen for the same thing. A large percentage may have all ready [sic] been addressed. DO NOT THROW ANY SICK CALL SLIPS AWAY - Write on NSC slip, Seen date, and sign. It appears that LPN's are throwing SC slips away. Paper trail has to remain in the chart. Documentation is subject to audit by contract monitor/Cap't Murphy and/or PRA. Submitted NSC slips, logged in the NSC log are subject to comparison with the actual chart. LPN's should stop telling the inmates that they will be on the list. . . . Just accept the NSC slip, and say no more.
>     Orders are missing also, either not on MAR [medical administration record] or MAR is missing. Papers in charts are still not being put where they belong. This can make it appear that the order has been missed.

(Pl. Ex. K at 2-3.)

In the April 8 minutes, the most relevant entry concerns when patients should be seen by doctors: "<u>NOTE:</u> If an I/M comes to medical for an 'emergency' and is seen by nursing x2 then refer to MD[.]" (Pl. Ex. L at 1).

Among the other items in the February 20 minutes are (1) a reminder to nurses to use the "SOAP" documentation method[8] (Pl. Ex. K at 1), (2) a reminder to nurses to "FOLLOW POLICY!!!" when inmates are non-compliant with medications and to record the information in the Progress Notes (<u>id.</u> at 2), and (3) an acknowledgment of the complaint that "[f]emales are always last to be seen" because arranging for females to be "escorted to Medical is an ongoing problem" and female inmates are "being carried over to the next day" before being seen. (<u>Id.</u> at 3.) The April 8 minutes also include (1) a note that MARS "are in better shape than they have been but still need some work" (Pl. Ex. L at 1), and (2) a reminder "to follow Capt. Murphy's memo concerning emergency 'buzz' words i.e. chest pain, can't breathe bleeding profusely etc." (<u>Id.</u>)

**v. Medical reports**

Jennifer Graney, R.N., is a registered Professional nurse who was hired by Plaintiff's counsel to review "the adherence to

---

[8] SOAP is an acronym to remind nurses to document the <u>S</u>ubjective complaints, <u>O</u>bjective data, <u>A</u>ssessment of the patient and treatment <u>P</u>lan for patient encounters. (DSF ¶ 26.)

guidelines set forth by CFG in relation to nursing policies and standards of care." (Pl. Ex. I at 1.) Graney concluded

> no one factor is solely the blame for Ms. McBride's very serious infection requiring surgery, but more the many inconsistencies in relation to adherence to policies set forth by CFG. These inconsistencies started with the failure proper handle [sic] sick call requests which led to a failure in assessing Ms. McBride's worsening condition and significantly increasing pain levels, followed by inadequate care based on a failure to be evaluated by a physician until the 5th clinic visit for the same problem. Poor charting contributed in relation to SOAP notes as well as improperly transcribed medications on the MAR, which created a delay in care. Additionally, the blood pressure monitoring was not complete and the failure to assess Ms. McBride's problems if not as pure trauma worthy of evaluation, but potentially identify the lesion/ contusion as a potential source of MRSA, a condition the staff has to be well informed of given the type of facility and potential infection control issues. All this combined seems fair to conclude that the lack of consistent clinical adherence to known healthcare policy may meet the idea of deliberate indifference as the cause of Ms. McBride's general deterioration and subsequent requirement for surgical intervention and hospitalization.

(Pl. Ex. I at 5.) Defendant observes, and Plaintiff admits, that Graney does not criticize CFG's policy as written, but rather the non-compliant conduct of the medical staff. (DSF ¶ 22, PCF ¶ 22.) Defendant also points out that some of Graney's criticisms are not causally related to Plaintiff's injury. (See, e.g., DSF ¶ 29.) Plaintiff appears to concede the point, arguing that some of the criticisms in Graney's report, such as the alleged failure to take or record blood pressure readings, are "concern[s] similar

to others found throughout Ms. McBride's treatment." (PCF ¶ 29(d)(I).)

Defendant counters with its own medical expert reports. Dr. Kathleen Casey reviewed Plaintiff's case and stated that "most hematomas do not become infected. Therefore, it is certainly not routine practice to institute antibiotic therapy at the onset of a hematoma." (Def. Ex. H at 3.) Dr. Casey adds that "[i]t is impossible to say when the hematoma evolved into an abscess. . . . Given the scenario of a hematoma evolving into an abscess over the sternum[,] an incision and drainage procedure and 6 weeks of IV antibiotics would have been indicated for acute osteomyelitis regardless of the time it was recognized." (Id. at 4.) Dr. Casey notes that the "organism did turn out to be methicillin-resistant and therefore would not have responded either to Rocephin or the Keflex" and opines that "I do not feel that the medical caregivers in the jail were negligent in any way. I feel they acted promptly once they recognized that this appeared to be becoming secondarily infected." (Id. at 3-4.)

Dr. David Kountz, also on behalf of Defendant, reviewed Plaintiff's case and concluded that the "overall management of Ms. McBride between 3/31/08 and 4/7/08 was consistent with the policies and procedures that were in place for sick call at CFG during this time. It is my opinion that CFG policies in place were consistent with accepted standards of care in correctional facilities." (Def. Ex. I at 2.)

**B. Procedural history**

Plaintiff filed this suit in New Jersey Superior Court in Atlantic County and Defendants removed the matter to federal court. [Docket Item 1.] Only County of Atlantic, New Jersey, and CFG filed answers to the Complaint. [Docket Items 2 & 4.] CFG moved for summary judgment on claims alleging negligent medical treatment [Docket Item 13], which the Court granted because "Plaintiff failed to file an affidavit of merit to support her state medical malpractice claims within 60 days of Defendant's answer, as required by N.J. Stat. Ann. § 2A:53A-27, and because Plaintiff's malpractice claims do not fall within the common knowledge exception to § 2A:53A-27 . . . ." McBride, 2011 WL 3236212, at *5.

Defendant CFG now moves for summary judgment on all claims brought under 42 U.S.C. § 1983 and the New Jersey Constitution.[9] [Docket Item 36.]

## III. Discussion

### A. Standard of review

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if, based on the evidence in the record, a reasonable jury could return a verdict for the

---

[9]  Counsel for CFG requests that all § 1983 claims and state constitutional claims be dismissed against Defendant Nurse Loeffler as well as CFG. Although the original motion was filed "on behalf of the Defendant CFG Health System [sic] LLC" [Docket Item 36-2], Defendant's reply brief concludes: "Defendants CFG Health Systems LLC and Joanne Loeffler respectfully request that Summary Judgment be entered dismissing all claims with prejudice." (Def. Reply Br. at 28.) Defense counsel writes: "Joanne Loeffler was deposed and clearly her role in this case has been analyzed by plaintiff's expert in both the moving and opposition papers. No additional discovery was sought by plaintiff as to Joanne Loeffler. Therefore although an Answer was not filed on her behalf it is respectfully that [sic] this Motion for Summary Judgment has been addressed by both plaintiff and defendant for consideration of claims against her." (Def. Reply Br. at 1.)

The Court will not construe Defendant Loeffler to be a moving party for purposes of this motion. Nurse Loeffler has not answered the Complaint and no one, including Thomas Decker, Esq., counsel for CFG, has entered an appearance on Nurse Loeffler's behalf in this matter. She has not participated in motion practice. Most importantly, it is not immediately apparent that the analysis of Nurse Loeffler's behavior is identical to that of CFG's supervisory liability. Because the parties have not briefed all legal issues as they concern Nurse Loeffler, the Court will consider this motion for summary judgment only as it concerns CFG, as the original filing states.

non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the suit. <u>Id.</u> The court will view evidence in the light most favorable to the non-moving party and "all justifiable inferences are to be drawn in [that party's] favor." <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999).

**B. Section 1983 claim for violation of the due process clause of the Fourteenth Amendment**

**i. Complaint and arguments**

The Complaint alleges that Defendant violated Plaintiff's right to adequate medical care as a pretrial detainee, protected by the due process clause of the Fourteenth Amendment (Count Three) and Article I, Paragraph 1 of the New Jersey Constitution (Count Four). (Compl.) Defendants move for summary judgment arguing that Plaintiff has not established that her constitutionally protected rights were violated by a policy, practice or custom of CFG, or, in the alternative, Plaintiff fails to establish causation between any policy and an alleged injury. (Def. Mot. Br. at 9.) Defendant argues that, at most, the record contains evidence of negligence on the part of CFG employees, which is not actionable against CFG under § 1983, or that employees deviated from CFG's policy, which, without more, is not actionable under § 1983, either. (<u>Id.</u> at 15-16, 18.) Defendant deflects Plaintiff's other criticisms of CFG nurses or policies as irrelevant to Plaintiff's injury or care, arguing a

17

lack of causation. (Id. at 16-17.) "The plaintiff did not establish during discovery that there are any policies or procedures promulgated by CFG with deliberate indifference to the consequences that directly caused an alleged violation of the plaintiff's constitutional rights." (Id. at 18.)

Plaintiff generally alleges that CFG failed "to provide appropriate medical care" and asserts that her burden is to show CFG acted with deliberate indifference to Plaintiff. (Pl. Opp'n at 4.) Plaintiff contends that "[s]uch indifference constitutes the 'policy or custom' that is the predicate for entity liability" under § 1983. (Id.) Plaintiff asserts that the record evidence is "more than sufficient to allow a reasonable jury to conclude that CFG was deliberately indifferent to the appropriate medical needs of its inmates," and that "CFG's deliberate indifference was the 'moving force' behind the constitutional violation in this case." (Id. at 9-10.) Plaintiff argues that the evidence shows that: (1) "there were problems with CFG's medical services," (2) the medical unit did not properly comply with physicians' orders, (3) the medical staff improperly documented patient contact, (4) employees threw away sick call slips, (5) female inmates were not being seen in a timely fashion, (6) the medical staff improperly filed and formatted medical records, (7) the medical staff did not triage medical problems properly, (8) the medical staff unreasonably delayed Plaintiff's care, and (9)

18

the staff members failed to administer Plaintiff's medication
properly. (Id. at 6-9). Plaintiff concludes that "[t]aken
cumulatively . . . these facts are more than sufficient to allow
a reasonable jury to conclude that CFG was deliberately
indifferent to the appropriate medical needs of its inmates."
(Id. at 9.)

### ii. Liability under Section 1983 and the Fourteenth Amendment for inadequate medical treatment

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff
must prove "(1) that the conduct complained of was committed by a
person acting under color of state law; and (2) that the conduct
deprived the plaintiff or rights, privileges, or immunities
secured by the Constitution or laws of the United States."
Schneyder v. Smith, 653 F.3d 313, 319 (3d Cir. 2011). A
municipality or other state actor cannot be liable under § 1983
on the basis of respondeat superior. A.M. ex rel. J.M.K. v.
Luzerne Cnty. Juvenile Detention Ctr., 372 F.3d 572, 580 (3d Cir.
2004) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-
92 (1978)). Rather, liability is established when the
"government's policy or custom, whether made by its lawmakers or
by those whose edicts or acts may fairly be said to represent
official policy, inflicts the injury" and "there is a 'direct
causal link between a municipal policy or custom and the alleged
constitutional deprivation . . . .'" Jiminez v. All American
Rathskeller, Inc., 503 F.3d 247, 249-50 (3d Cir. 2007) (quoting

Monell and City of Canton v. Harris, 489 U.S. 378, 385 (1989)).

The plaintiff must show that "a government policymaker is

responsible by action or acquiescence for the policy or custom"

and that the government acted "with deliberate indifference to

the purported constitutional deprivation in order to ground

liability." Jiminez, 503 F.3d at 250. See also City of Canton,

489 U.S. at 392 (holding that claims alleging a city's failure to

train its employees "can only yield liability against a

municipality where that city's failure to train reflects

deliberate indifference to the constitutional rights of its

inhabitants").

        CFG concedes that it is a state actor for § 1983 purposes.

(Def. Mot. Br. at 11.) Therefore, in this case, Plaintiff has the

burden to show that CFG, through its own policy or acquiescence

to its employees' custom, manifested deliberate indifference to

the violation of Plaintiff's constitutional rights. See Beers-

Capitol v. Whetzel, 256 F.3d 120, 134 (3d Cir. 2001) (holding

that supervisory liability on an Eighth Amendment claim requires

a showing that "(1) the existing policy or practice created an

unreasonable risk of the Eighth Amendment injury; (2) the

supervisor was aware that the unreasonable risk was created; (3)

the supervisor was indifferent to that risk; and (4) the injury

resulted from the policy or practice").

The specific constitutional violation alleged by Plaintiff is inadequate medical treatment, in violation of the Fourteenth Amendment, while a pretrial detainee at the ACJF. Pretrial detainees claiming inadequate medical treatment are protected by the Fifth and Fourteenth Amendments, not the Eighth Amendment. Jackson v. City of Philadelphia, Nos. 12-2986 & 12-3187, 2013 WL 363463, at *3 (3d Cir. Jan. 31, 2013) (citing Williams v. Mussomelli, 722 F.2d 1130, 1133 (3d Cir. 1983)). However, the Third Circuit has termed this "a distinction without a difference, as the Fourteenth Amendment provides at least as much protection as the Eighth Amendment." Jackson, 2013 WL 363463, at *3. Courts in this circuit generally apply the Eighth Amendment standard in Fourteenth Amendment cases such as this. See, e.g., Smith v. Merline, 797 F. Supp. 2d 488, 499-500 (D.N.J. 2011) (analyzing the Eighth Amendment standard, stating that "the Court will not invent a higher standard where the Plaintiff does not ask for one," and applying the Eighth Amendment standard to a pretrial detainee claiming inadequate medical treatment).

To survive summary judgment for failure to provide adequate medical treatment, Plaintiff must point to evidence in the record raising a genuine dispute of fact whether "(1) Plaintiff suffered from a serious medical need, and (2) whether Defendants committed acts or omissions that indicate deliberate indifference to that need." Smith, 797 F. Supp. 2d at 500. See also Jackson, 2013 WL

21

363463, at *3 (reciting the same standard and citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Thus, a constitutional violation of this kind requires proof of both objective and subjective components. Hankey v. Wexford Health Sources, Inc., 383 F. App'x 165, 168 (3d Cir. 2010) (citing Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002)); see also Farmer v. Brennan, 511 U.S. 825, 837 (1994) ("We reject petitioner's invitation to adopt an objective test for deliberate indifference").

In cases alleging delayed medical treatment, the subjective element, deliberate indifference, "is shown when a prison official intentionally denies or delays access to medical care or intentionally interferes with treatment after it is prescribed." Jackson, 2013 WL 363463, at *3 (citing Estelle, 429 U.S. at 104-05). The Third Circuit has stated deliberate indifference "requires 'obduracy and wantonness,' Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); see also Brown v. Thomas, 172 F. App'x 446, 450 (3d Cir. 2006) (stating that the state actor "must be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference," citing Farmer, 511 U.S. at 837). The Third

Circuit has found deliberate indifference "in a variety of circumstances, including where the prison official . . . delays necessary medical treatment based on a non-medical reason;" Rouse, 182 F.3d at 197; however, "medical judgments by doctors or prison officials that later prove inappropriate or negligent are not alone sufficient to give rise to an Eighth Amendment claim." Hankey, 383 F. App'x at 168 (citing Estelle, 429 U.S. at 104-07, and Farmer, 511 U.S. at 835, among others). "Accordingly, when some medical care is administered by officials that arguably falls below the generally accepted standard of care, that medical care is often sufficient to rebut accusations of deliberate indifference and preclude a finding of an Eighth Amendment violation." Id. at 169 (citing Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990)).

> ### iii. Whether the medical staff violated the constitution by acting with deliberate indifference to Plaintiff's serious medical needs

As an initial matter, the Court notes that there are two distinct deliberate indifference standards at play in the analysis of Plaintiff's claim: one built into the Eighth Amendment and Fourteenth Amendment standard for the underlying constitutional violation, and one for the § 1983 analysis to establish acquiescence to the alleged custom of CFG employees. Accord City of Canton, 489 U.S. at 380 n.8 ("The 'deliberate indifference' standard we adopt for § 1983 'failure to train'

claims does not turn upon the degree of fault (if any) that a plaintiff must show to make out an underlying claim of a constitutional violation.").

It is also important to note that evidence that the CFG medical staff failed to follow the written CFG policy is not, on its own, evidence of an underlying constitutional violation. This is true even if that same evidence tends to show a custom of disregarding CFG's policy for purposes of the § 1983 analysis. The CFG policy is not constitutional doctrine, and therefore contravention of the policy does not necessarily violate the Fourteenth Amendment. For the purpose of determining whether Plaintiff's medical care violated the constitution, the CFG policy is irrelevant; the policy becomes relevant when considering whether CFG's policy or custom caused the constitutional violation. Whether Plaintiff received constitutionally inadequate medical care must be determined by looking at the care Plaintiff did or did not receive, rather than what CFG mandated or recommended that Plaintiff receive on paper.

Here, Plaintiff has created a genuine issue of fact whether Plaintiff suffered from a serious medical need. (See Pl. Ex. A & Ex. B (describing the special procedure Plaintiff required and the concern by some medical professionals that "she may lose her left lung"); see also Def. Ex. D. (describing Plaintiff's complaints, pain level and trouble breathing and sleeping)).

24

However, Plaintiff has not pointed to evidence that shows either Nurse Davenport or another member of the medical staff acted with deliberate indifference to Plaintiff's serious medical needs. Therefore, Plaintiff suffered no constitutional injury.

Plaintiff's main allegation is that the medical staff unduly delayed Plaintiff's first visit with a physician until a week after her fall and that delay resulted in, or contributed to the increased severity of, Plaintiff's infection that required special surgery. (Pl. Opp'n at 7-9.) To survive summary judgment, Plaintiff must point to evidence that someone on the medical staff was aware of a substantial risk of serious harm and that employee also disregarded that risk. Brown, 172 F. App'x at 450. Plaintiff adduces some evidence that the medical staff violated CFG's policy while caring for Plaintiff,[10] but points to no evidence that a member of the medical staff was aware of a serious risk of harm to Plaintiff and deliberately disregarded that risk. There is no evidence that anyone on the staff intentionally delayed Plaintiff's access to medical care. See Jackson, 2013 WL 363463, at *3 (stating deliberate indifference is shown when the prison official "intentionally . . . delays access to medical care"). Thus, the record does not contain

---

[10]   This evidence includes, for example, Graney's report (Pl. Ex. I), Graney's deposition (Def. Ex. F), and the medical records themselves (Def. Ex. D).

evidence that the CFG staff acted with deliberate indifference to Plaintiff's serious medical needs.

Plaintiff received medical treatment from nurses four times during the week following her fall, and interacted with other medical staff on at least two other dates. She was seen twice by nurses on March 31, once by Nurse Loeffler on April 1, once by the x-ray technician on April 2, once by Nurse Davenport on Friday, April 4, and once by the dentist on April 5, at which point she received antibiotics. She then saw a doctor on Monday, April 7. Every time Plaintiff submitted a sick call slip, she was seen that day or the next day,[11] and all of the nurse encounters were documented in Plaintiff's Progress Notes in her medical file. The medical staff increased Plaintiff's pain medication as a result of her continued complaints and continued to monitor her situation and order x-rays, despite negative results from previous x-rays. The record thus contains evidence of repeated medical attention given by the CFG staff to Plaintiff. Evidence of some medical attention, even if it arguably falls below the generally accepted standard of care, often precludes a finding of an Eighth Amendment violation. Hankey, 383 F. App'x at 169; accord Brown, 903 F.2d at 278 ("it is well established that as

---

[11]  Plaintiff testified that she made an unanswered request for medical treatment on April 1, after being seen by Nurse Loeffler earlier that day. (McBride Dep. at 74:24-76:15.) Plaintiff did not make a written request for additional medical care until April 3, which was triaged and Plaintiff was seen the following day. (Def. Ex. D. at 5-6, 11.)

long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights"). The record evidence does not support a claim that the medical care Plaintiff received was inadequate under the Fourteenth Amendment.

Another of Plaintiff's allegations is that the medical staff failed to recognize the severity of her condition in a timely fashion. (Pl. Opp'n at 8.) Record evidence suggests that none of the nurses considered Plaintiff's condition so serious as to require immediate attention from a physician. However, this allegation sounds in negligence, and mere negligence by medical staff does not violate the constitution. Farmer, 511 U.S. at 835 (stating that "deliberate indifference describes a state of mind more blameworthy than negligence"). There simply is no evidence in the record that any of the nurses who examined and treated Plaintiff was aware of facts from which an inference could be drawn that a substantial risk of harm existed and that the nurse actually drew that inference. See Brown, 172 F. App'x at 450 (stating that the state actor "must be aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference"); see also Farmer, 511 U.S. at 838 ("an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment"). In addition, there

27

is no evidence that a different response to Plaintiff's April 3 sick call slip would have affected Plaintiff's infection.[12] Although Plaintiff distinguishes between care administered by a nurse and a doctor (Pl. Opp'n at 8-9), the constitution does not. The Fourteenth Amendment requires that nurses do not deliberately disregard a substantial risk of serious harm to the detainee. The record evidence may be enough to raise a genuine issue of fact as to medical malpractice, but medical malpractice, without more, does not violate the Fourteenth Amendment.

The rest of Plaintiff's arguments are either irrelevant to the constitutional inquiry or unsupported by evidence. Plaintiff argues that the medical staff "failed to perform/record any assessment of her condition or take vital signs, despite this being four days after the fall." (Pl. Opp'n at 6.) To the contrary, every nurse interaction was recorded in Plaintiff's Progress Notes, and Plaintiff has failed to show how the alleged

---

[12] (See Graney Dep. at 72:3-10 (testifying that it was beyond Graney's expertise to opine whether earlier treatment would have changed the outcome for Plaintiff); see also McBride Dep. at 98:15-18, 99:13-14 (testifying that Dr. Pappastomulus told Plaintiff that "I waited too long, that it got infected" and that "there was too much waiting" and "[i]t wasn't done right away"); Def. Ex. H (Dr. Casey stating that the medical care was not negligent and that an incision and drainage procedure and six weeks of antibiotics would have been required "regardless of the time" the infection was recognized).) Plaintiff points to no expert testimony that suggests the infection would have been less severe or avoided if Plaintiff had been seen by a physician immediately upon Plaintiff's April 3 written request. The record shows that Plaintiff received antibiotics on April 5 (PCF ¶ 75), within two days of her written request on April 3, even though she didn't see a doctor until April 7.

failure to take vital signs or the recording of vital signs, caused Plaintiff's injury. The fact is that Plaintiff was seen repeatedly by nurses who evaluated her and did not identify her condition as emergent.

Plaintiff also makes several allegations that the medical staff failed to document interactions or failed to maintain proper medical files. (Pl. at 6-8.) Again, Plaintiff fails to show how these alleged deficiencies caused Plaintiff's injury, given that Plaintiff received repeated attention throughout the week following her fall and all interactions with the nurses were recorded in Plaintiff's Progress Notes. The record shows that Plaintiff received medical treatment the day of, or the day after, submitting each sick call slip. If Plaintiff's written requests were discarded rather than kept for her medical file, that did not prevent her from being seen and treated by the nursing staff.

Plaintiff also alleges that the medical staff failed to comply with orders and did not respond to a change in Plaintiff's pain medication for three days. (Pl. Opp'n at 6, 9.) There is no record evidence to suggest that the difference in pain medication had any effect on Plaintiff's infection. (See Graney Dep. at 79:7-13 (testifying that an increased dose of Tylenol would not have an impact on the development of the infection, but would have affected Plaintiff's comfort); PCF ¶ 28(c) (agreeing that

"failure to receive the increased dose of Tylenol had no [e]ffect on the progression of the infection".) Finally, Plaintiff alleges that female detainees are last to be seen, but the record contains no evidence that Plaintiff's treatment was delayed in any way because of her gender. The medical staff saw Plaintiff repeatedly throughout the week and within a day of each written request.

Taken as a whole, the record contains some evidence that the CFG medical staff did not follow all provisions of CFG's policy, but the record is devoid of evidence that those violations caused Plaintiff's injury or that any staff member intentionally denied or delayed Plaintiff's access to medical care. Plaintiff has not pointed to evidence from which a reasonable jury could find that the medical staff acted with deliberate indifference to Plaintiff's serious medical need, and therefore Plaintiff cannot sustain a claim for inadequate medical treatment under the Fourteenth Amendment.

### C. Whether CFG acquiesced to a custom of employees disregarding CFG's written policy

Even if Plaintiff could establish a constitutional violation, Defendant CFG would be entitled to summary judgment because the record does not contain evidence that CFG acquiesced to a custom of CFG employees disregarding the triage policy.[13] To

---

[13]   Plaintiff does not argue, and the record does not contain evidence suggesting, that CFG's written policy regarding sick call requests caused Plaintiff's injury. Rather, Plaintiff

prevail on a § 1983 claim based on supervisory liability, Plaintiff must show that CFG (1) acquiesced to a custom of disregarding the written policy and (2) was deliberately indifferent to the constitutional violation for inadequate medical care. See Jiminez, 503 F.3d at 250 (stating that, to prevail on a supervisory liability claim under § 1983, the plaintiff has the burden to show the government policymaker was "responsible by action or acquiescence for the policy or custom" and that the government acted "with deliberate indifference to the purported constitutional deprivation").

Plaintiff points to various infractions of the CFG policy to indicate a pattern of substandard medical care, including that nurses did not format their notes correctly, or that they threw away sick call slips. (Pl. Opp'n at 7-8.) But few of the Plaintiff's allegations are implicated by the facts of this case,[14] and thus the record does not contain evidence raising an issue of causation from all the alleged infractions to

_____

alleges various ways in which the medical staff violated the CFG policy. Therefore, to maintain a claim under § 1983, Plaintiff must raise an issue of fact whether CFG's acquiescence to employees disregarding its triage policies constitutes deliberate indifference on the part of CFG.

[14] The formatting of the notes and throwing away sick call slips played no role in Plaintiff's care. Plaintiff was seen by the medical staff the day she submitted each request or the day after, so no issue of throwing away call slips affected her ability to be seen by the staff. In other words, whether staff discarded sick leave slips under these circumstances is not a material fact. Nurses recorded relevant information in Plaintiff's Progress Notes, even if they did not follow a specific formatting style.

Plaintiff's injury. The gravamen of Plaintiff's Complaint is that the medical staff did not identify Plaintiff's condition as emergent and that the nurses failed to automatically refer Plaintiff to a doctor upon request after she had seen the nurse practitioner twice. Therefore, to defeat summary judgment, Plaintiff must point to evidence showing CFG acquiesced to a custom of the medical staff failing to diagnose emergent matters or a custom of failing to refer patients to doctors after being seen twice by a nurse practitioner. Evidence of acquiescence to policy violations not material to Plaintiff's treatment cannot have caused Plaintiff's injury.

Plaintiff relies heavily on staff meeting notes from meetings on February 20 and April 8 to show a pattern of inadequate medical care at the ACJF. (Pl. Ex. K & L.) But that evidence, even if it does permit an inference that a custom of sloppy record-keeping existed, does not indicate CFG's indifference to inmates' medical needs; it suggests the opposite. The February 20 minutes show that CFG identified some noncompliance with the handling of sick call slips and reminded the staff about the proper procedure. (Pl. Ex. K at 2-3.) CFG also reminded the staff that medical records are subject to audit, by a contract monitor, by Captain Murphy, or by Professional Rehab Associates -- another indication that CFG sought to police policy compliance rather than acquiesce to non-

compliant conduct. (<u>Id.</u>) The April 8 minutes include the reminder to "[c]ontinue to follow Capt. Murphy's memo concerning emergency 'buzz' words" and the observation that "[t]his new process has already cut down on the amount of the above complaints." (Pl. Ex. L at 1.) The minutes also include the statement: "<u>NOTE:</u> If an I/M comes to medical for an 'emergency' and is seen by nursing x 2 then refer to MD[.]" (<u>Id.</u>) Even if these minutes are sufficient, on their own or in conjunction with other record evidence, to raise an inference that a custom of disregarding CFG policy existed, the minutes themselves also tend to refute the allegation of deliberate indifference. By providing a written policy setting forth procedures for nurses to follow, observing employee conduct, identifying shortcomings, and reminding staff of proper procedures, CFG and the staff meeting minutes show that CFG did not acquiesce to a custom of policy violations, must less that CFG was deliberately indifferent to any constitutional injuries that might result.

The other evidence Plaintiff points to regarding her care mostly focuses on her own experience, and the fact that nurses did not properly triage Plaintiff's sick call slip on April 3 cannot, on its own, establish a custom. <u>See</u> <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985) (Rehnquist, J., writing for a plurality) (stating that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability

33

under <u>Monell</u>" when the municipal actor does not have policymaking authority); <u>see</u> <u>also</u> <u>Ingram v. Twp. of Deptford</u>, No. 11-2710, 2012 WL 5984685, at *11 (D.N.J. Nov. 28, 2012) (discussing cases in which one or two instances of unconstitutional activity did not establish a custom or policy for purposes of § 1983).

The record certainly contains evidence that could cause a reasonable jury to find that the medical staff committed various infractions of the CFG policy, but not all of those infractions are material to this case. Even if the testimonial evidence and the meeting notes can be construed to establish a custom of failing to diagnose emergent conditions or failing to refer inmates to see a doctor in a timely manner, the record does not contain evidence that CFG was deliberately indifferent to the serious medical needs of the inmates. Rather, the record evidence shows CFG was aware of possible infractions and took steps to prevent future infractions by reminding the staff of the written policy. Therefore, even if Plaintiff suffered a constitutional injury, which this Court holds she did not, Defendant still would be entitled to summary judgment due to lack of proof of deliberate indifference.

**D. Article I, Paragraph 1 of the New Jersey Constitution**

Plaintiff brings identical allegations against Defendants under Article I, Paragraph 1 of the New Jersey Constitution. That paragraph "encompasses the same due process rights guaranteed

under the Federal Constitution." CBS Outdoor Inc. v. N.J. Transit
Corp., No. 06-2428, 2007 WL 2509633 at *18 n.19 (D.N.J. Aug. 30,
2007), aff'd sub nom., Carole Media LLC v. N.J. Transit Corp.,
550 F.3d 302 (3d Cir. 2008) (citing Montville Twp. v. Block 69,
Lot 10, 74 N.J. 1, 18-19 (1977)). In addition, the Eighth
Amendment "and the parallel paragraph in the New Jersey State
Constitution have been interpreted to provide congruent relief in
the deliberate indifference context." White v. New Jersey, No.
09-4802, 2012 WL 1150830, at *18 (D.N.J. Apr. 4, 2012), aff'd,
No. 12-2167, 2013 WL 772708 (3d Cir. Mar. 1, 2013); see also
Szemple v. Corr. Med. Servs., Inc., 493 F. App'x 238, 2012 WL
3090831, at *2 (3d Cir. July 31, 2012) (stating that N.J. Const.
art. I, ¶ 12 "is generally interpreted as analogous to the Eighth
Amendment"). The parties do not contend that the New Jersey
Constitution offers more or less protection to Plaintiff than the
U.S. Constitution. Therefore, because Defendants are entitled to
summary judgment on the federal constitution claim for the
reasons explained above, the Court will grant summary judgment on
the state constitution claim.

**IV.   CONCLUSION**

The Court will grant Defendant CFG's motion for summary

judgment on all remaining claims under § 1983 and the New Jersey

Constitution. An accompanying Order will be entered.


**April 10, 2013**                           **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              Chief U.S. District Judge